**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 25-1332**

───────────────

JOANN WRIGHT HAYSBERT,

Plaintiff – Appellant,

v.

OUTBACK STEAKHOUSE OF FLORIDA, LLC,

Defendant – Appellee

and

BLOOMIN' BRANDS, INC.,

Defendant.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  Elizabeth W. Hanes, District Judge.  (4:24-cv-00087-EWH-RJK)

───────────────

Argued:  May 8, 2026                                   Decided:  August 10, 2026

───────────────

Before KING, THACKER, and BERNER, Circuit Judges.

───────────────

Affirmed by published opinion. Judge Berner wrote the opinion, in which Judge King and Judge Thacker joined.

───────────────

**ARGUED:**  Judah Jacob Ariel, ARIEL LAW, Washington, D.C., for Appellant.  John D. McGavin, MCGAVIN, BOYCE, BARDOT, THORSEN & KATZ, P.C., Fairfax, Virginia, for Appellee.  **ON BRIEF:**  Emily K. Blake, William W. Miller, MCGAVIN, BOYCE,

BARDOT, THORSEN & KATZ, P.C., Fairfax, Virginia, for Appellee.

_____

BERNER, Circuit Judge:

Dr. Joann Wright Haysbert was injured after she slipped and fell inside an Outback Steakhouse restaurant in Virginia. She filed suit, asserting that her injuries were caused by Outback's negligence. The litigation became unusually contentious—so contentious that the district court eventually declared a mistrial. Sometime later the district court granted Dr. Haysbert's motion to dismiss her case without prejudice, though the district court ordered strict limits placed on discovery should the case be refiled in the future. When Dr. Haysbert refiled her lawsuit, further complications ensued. Following the close of the second trial, a jury ruled for Outback.

On appeal, Dr. Haysbert contends the district court violated the due process rights of her attorney who represented her in the first trial by revoking his *pro hac vice* admission after it declared a mistrial. She also argues that the district court abused its discretion by precluding her expert witness from testifying in the second trial. Finally, she argues that the district court clearly erred in denying the challenge she made pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to Outback's use of a peremptory strike to eliminate a Black potential juror from the jury pool.

For the reasons that follow, we reject Dr. Haysbert's arguments and affirm the challenged rulings of the district court.

## I.    Background

Joann Wright Haysbert, Ed.D., slipped and fell while picking up a take-out order at an Outback Steakhouse restaurant in Chesapeake, Virginia. At the time of the fall,

3

Dr. Haysbert was Vice President and Provost of Hampton University, a historically Black university in Hampton, Virginia. Dr. Haysbert alleges that she suffered a traumatic brain injury and sustained cognitive impairments as a result of the fall.

Dr. Haysbert filed an action for negligence against Outback and its parent company in Virginia state court.[1] Outback removed the case to federal court based on diversity jurisdiction. The district court granted Nazareth Haysbert (Attorney Haysbert), a member in good standing of the Bar of the State of California, authorization to represent Dr. Haysbert *pro hac vice* in the district court. Attorney Haysbert is Dr. Haysbert's son.

## A. *Haysbert I*

The first trial in this case began on August 8, 2023, and lasted for five days. We refer to this trial as *Haysbert I*. Dr. Haysbert testified at trial along with expert witnesses, including Dr. Aaron Filler. Dr. Filler had not examined Dr. Haysbert before testifying in *Haysbert I*, though he had ordered and reviewed medical imagery of her injuries. Dr. Filler also based his opinion upon the expert report of an expert witness who did not testify at trial. Because the expert who produced the underlying report did not testify, the district court precluded Dr. Filler from referencing or relying upon that expert's report.

Throughout *Haysbert I*, Attorney Haysbert engaged in unprofessional and inappropriate conduct. For example, Attorney Haysbert repeatedly disregarded the district court's instructions and violated pretrial rulings. He regularly provided inconsistent and

---

[1] Outback's parent company Bloomin' Brands, Inc. was subsequently dismissed and is not a party to this appeal.

4

misleading representations to the district court. He interrupted and spoke over the court and opposing counsel. Most troublingly, on two occasions Attorney Haysbert made outbursts in front of the jury. On one of these occasions, the presiding judge became so alarmed by Attorney Haysbert's behavior that the judge almost pressed the panic button to summon the United States Marshal Service into the courtroom. Furthermore, despite explicit instructions from the court not to mention Outback's liability insurance in front of the jury, Attorney Haysbert also repeatedly referenced the issue of insurance in questioning witnesses. As a result of Attorney Haysbert's conduct, counsel for Outback moved for a mistrial and for the revocation of Attorney Haysbert's *pro hac vice* admission.

The district court held a fulsome hearing on both motions. The district court granted Outback's motion for a mistrial, noting that, in almost forty years on the bench, it could not recall having declared a mistrial in a civil case. Though the district court initially declared the mistrial in an oral ruling, it later supplemented that ruling with a written order. The district court also granted Outback's motion to revoke Attorney Haysbert's *pro hac vice* admission, citing a long list of Attorney Haysbert's improper trial practices and unprofessional behavior. The district court ordered the case reassigned to a new judge and gave Dr. Haysbert twenty-one days to notify the court if she wished to set a new trial date.

Dr. Haysbert requested a date for a new trial. Dr. Haysbert's local counsel withdrew from representing her on October 12, 2023. Dr. Haysbert initially proceeded with the case representing herself without legal counsel. On October 30, 2023, the newly assigned district court judge entered a scheduling order providing for trial to begin on February 5, 2024. On December 18, 2023, however, less than two months before the second trial was

5

set to begin, Dr. Haysbert moved to voluntarily dismiss her case without prejudice. In her motion, Dr. Haysbert represented that she had been unable to retain legal counsel and was unable to represent herself because of the traumatic brain injury she allegedly sustained after she slipped and fell at the Outback restaurant.

Outback opposed Dr. Haysbert's motion, arguing that dismissing the case without prejudice to Dr. Haysbert's ability to refile in the future would unfairly prejudice Outback. Outback highlighted the significant costs and attorneys' fees it had incurred in litigating the case thus far. Outback also maintained that voluntary dismissal without prejudice was improper because Dr. Haysbert had unduly delayed seeking such relief. Finally, Outback argued that Dr. Haysbert's inability to secure legal counsel could not support granting a dismissal without prejudice.

On January 3, 2024, while Dr. Haysbert's motion for voluntary dismissal was pending, Dr. Haysbert met with Dr. Filler for a telehealth visit. Immediately following the visit, Dr. Filler prepared a report which he labeled "New Patient Evaluation Report" (the NPE Report). In the NPE Report, Dr. Filler summarized the history and symptoms relating to Dr. Haysbert's injury. He also reviewed new health information about Dr. Haysbert that he learned during the telehealth visit. Significantly, in the NPE Report, Dr. Filler offered his opinion about the cause of Dr. Haysbert's injuries and symptoms. Dr. Filler stated that it is his "impression to a reasonable degree of medical certainty that the fall [Dr. Haysbert] suffered on May 23, 2018, was due to extrinsic factors such as she describes a slipperiness on the floor and that it did cause sufficient impact to have produced post concussive symptoms." Parties' Joint Appendix (J.A.) 801.

6

The district court granted Dr. Haysbert's motion for voluntary dismissal without prejudice approximately two weeks later. In granting the motion, the district court imposed several conditions intended to mitigate any potential prejudice to Outback that could result from the dismissal without prejudice. The district court ordered that, if Dr. Haysbert were to refile her lawsuit, the parties would not be permitted to engage in any additional discovery, the parties could not supplement the expert designations or exhibits that had been disclosed in *Haysbert I*, and all pretrial determinations from *Haysbert I* would carry over in any new litigation. Taken together, these conditions were meant to ensure that a refiled case would commence in the same posture as if the dismissal had never been granted.

## B. *Haysbert II*

The district court scheduled the second trial to commence on February 25, 2025. We refer to this trial as *Haysbert II*. The district court issued a scheduling order that reiterated the court's previous admonition against conducting additional discovery and clarified that the case was to go forward "procedurally in the same position" as *Haysbert I*. J.A. 1015. A final pretrial conference was scheduled for January 16, 2025. In preparation for that conference, the district court ordered the parties to submit exhibits and witness lists by January 9, 2025, one week before the trial was scheduled to begin.

Dr. Haysbert turned over Dr. Filler's NPE Report to Outback on January 10, 2025, one day after the court-imposed deadline for submission of exhibits and more than one year after Dr. Filler drafted it. Outback objected to the admission of the NPE Report, arguing

7

that it included supplemental information that Dr. Haysbert intended to rely upon to fill gaps that Outback had pointed out during Dr. Filler's testimony in *Haysbert I*. Outback also asked the court to sanction Dr. Haysbert by precluding Dr. Filler from testifying in *Haysbert II*. Outback argued that Dr. Haysbert had violated the court's order prohibiting additional discovery. In addition, Outback contended that it would be greatly prejudiced if Dr. Filler were permitted to testify because Dr. Filler would be unable to cabin his testimony to information he had during *Haysbert I.*

The district court heard argument on Outback's motions to exclude the NPE Report and to preclude Dr. Filler from testifying. The district court excluded the NPE Report as an automatic sanction, under Federal Rule of Civil Procedure 37(c)(1), for failing to submit the report in a timely manner in violation of Federal Rule of Civil Procedure 26(e). The district court also granted Outback's motion to exclude Dr. Filler from testifying. The district court agreed with Outback that permitting Dr. Filler to testify would unfairly prejudice its defense and that such prejudice could not be alleviated by limiting Dr. Filler's testimony.

Dr. Haysbert moved for reconsideration of the district court's sanctions order. She argued that excluding Dr. Filler's testimony was an excessive sanction in light of the minimal Rule 26(e) violation. Dr. Haysbert contended that excluding Dr. Filler's testimony would be manifestly unjust and deprive her of "fundamental due process and her right to bring her claims to the Court and jury for adjudication on the merits." J.A. 1005. The district court disagreed, concluding that excluding Dr. Filler from testifying was an appropriate sanction, "particularly in light of the history of the case." *Id.* at 1017.

8

The *Haysbert II* trial commenced on February 25, 2025, beginning with jury *voir dire* and jury selection. The initial jury pool contained thirty-five potential jurors. This pool was then reduced to fourteen potential jurors, only two of whom were Black. One of the Black potential jurors, Juror Number 1, had attended Hampton University and knew of Dr. Haysbert by reputation from her tenure as Vice President and Provost. Outback used its first peremptory strike to remove Juror Number 1 from the jury pool, having previously argued unsuccessfully that she should be removed for cause because of her familiarity with Dr. Haysbert.

Outback later used its third and final peremptory strike to remove the other Black potential juror, Juror Number 32. Juror Number 32 was approximately twenty-five years old and worked in the shipyard. Dr. Haysbert raised a *Batson* challenge to Outback's use of a peremptory strike against Juror Number 32, alleging that Outback improperly struck the potential juror because of his race.

In response, Outback explained that it elected to strike Juror Number 32 for three reasons: because he was "one of the small minority of jurors who said nothing," because he was the youngest person in the jury pool, and because he works in the shipyard. J.A. 1100. Outback expressed concern, because of Juror Number 32's silence during *voir dire*, it could only "speculate" about Juror Number 32's knowledge and background. *Id.* Outback noted that other potential jurors in the jury pool had been "very thorough and responsive," *id.* while Juror Number 32, "didn't respon[d] to a single question." *Id.* Outback explained that "rather than take a chance and speculate on [Juror Number 32's] ability to be fair, [the company] elected to strike him." *Id.*

9

Dr. Haysbert argued that Outback's proffered reasons were not the true reasons for Outback's use of the peremptory. Dr. Haysbert attempted to show that other potential jurors shared at least one of the same race-neutral qualities listed by Outback. Dr. Haysbert further argued that Outback's proffered reasons were not "viable" or "appropriate" and "bore little connection to the case itself." *Id.* Dr. Haysbert pointed to the fact that Outback used two out of three of its peremptory strikes against Black potential jurors to suggest that Outback's true reason was the potential jurors' race. Dr. Haysbert urged the district court to find that, because Juror Number 32's race was "the only thing that distinguished him from the other potential jurors," race must have been Outback's reason for striking him. *Id.* at 1101.

After hearing from both sides, the district court made its ruling on the record. The district court determined that Dr. Haysbert met her burden to present a *prima facie* case under *Batson*. The district court next concluded that Outback satisfied its burden to articulate a race-neutral reason for striking Juror Number 32. The district court considered the parties' arguments and evidence. The district court expressed its view that Outback's reasons for thinking Juror Number 32 would not be favorable were "not wrong" and were "logical." *Id.* at 1103. The district court concluded that, on the record before it, Dr. Haysbert had not met her burden to show that race was a motivating factor in Outback's decision to strike Juror Number 32. The district court therefore denied the *Batson* motion.

Following a three-and-a-half-day trial, the jury found for Outback. The district court entered an order dismissing the case and ordering Dr. Haysbert to pay Outback's costs. Dr. Haysbert timely appealed.

10

## II.    Analysis

Dr. Haysbert argues that the district court erred in three ways: first, by revoking Attorney Haysbert's *pro hac vice* admission; second, by excluding Dr. Filler from testifying; and, third, by denying her *Batson* motion. We address each of these arguments in turn and affirm the rulings of the district court.

### A.    Attorney Haysbert's *Pro Hac Vice* Revocation

We first address Dr. Haysbert's appeal of the district court order revoking Attorney Haysbert's *pro hac vice* admission. We conclude that Dr. Haysbert has not met her burden to establish that she has standing to bring this claim.

Dr. Haysbert asserts that the district court violated Attorney Haysbert's constitutional right to due process by failing to provide proper notice and an opportunity to be heard prior to revoking his *pro hac vice* admission.[2] In response, Outback argues that Dr. Haysbert lacks standing to raise an alleged violation of Attorney Haysbert's due process rights.

---

[2] Significantly, Dr. Haysbert does not assert on appeal that the district court's revocation of Attorney Haysbert's *pro hac vice* admission violated *her own* due process or other constitutionally protected right. In response to questions during oral argument, counsel for Dr. Haysbert argued for the first time that his client had suffered a constitutional injury, namely her right to select the counsel of her choosing. This claim was not raised in Dr. Haysbert's brief on appeal and is therefore not properly before us. *See West Virginia CWP Fund v. Stacy*, 671 F.3d 378, 389 (4th Cir. 2011).

11

"[W]hen standing is questioned by . . . an opposing party, the litigant invoking the court's jurisdiction must . . . explain how the elements essential to standing are met." *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019). Dr. Haysbert provided no such explanation in her reply brief. When questioned during oral argument about Dr. Haysbert's standing to raise a claim based on an alleged violation of Attorney Haysbert's due process rights, counsel for Dr. Haysbert responded that his client possessed third-party standing.

Though generally a party may only assert her "own legal rights and interests, and cannot rest [her] claim to relief on the legal rights or interest of third parties," *Warth v. Seldin*, 422 U.S. 490, 499 (1975), a third party may under certain circumstances establish "standing to assert the rights of another," *Maryland Shall Issue Inc. v. Hogan*, 971 F.3d 199, 214 (4th Cir. 2020) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004)). To establish such third-party standing, a plaintiff "must demonstrate (1) an injury-in-fact; (2) a close relationship between [herself] and the person whose right [she] seeks to assert; and (3) a hindrance to the third party's ability to protect his or her own interests." *Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 14 F.4th 276, 288 (4th Cir. 2021) (quoting *Freilich v. Upper Chesapeake Health Inc.*, 313 F.3d 205, 215 (4th Cir. 2002)).

Even if we assume Dr. Haysbert met her burden to demonstrate injury-in-fact—in having been denied the counsel of her choosing—she has offered no explanation whatsoever for how she meets the second and third elements necessary to establish third-party standing. Because Dr. Haysbert failed to meet her burden on the threshold issue of standing, we lack jurisdiction to consider the merits of her claim that the district court

12

violated Attorney Haysbert's due process rights when it revoked his *pro hac vice* admission. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998) (holding that Article III jurisdiction, including standing, must be established before a federal court may reach the merits of a claim).

### B. Exclusion of Evidence

Next, Dr. Haysbert challenges the district court ruling excluding Dr. Filler from testifying as an expert in *Haysbert II*. Although Dr. Haysbert concedes that Dr. Filler's NPE Report was not disclosed in a timely manner, she maintains nevertheless that the district court abused its discretion by precluding Dr. Filler from testifying as a sanction for this failure to disclose. Having reviewed the record, we discern no abuse of discretion in the district court's ruling.

There is no dispute that Dr. Haysbert violated Federal Rule of Civil Procedure 26, in addition to the court's pretrial disclosure orders, by failing to disclose Dr. Filler's report in a timely manner. Federal Rule of Civil Procedure 37(c)(1) provides an automatic sanction of exclusion when a party violates Rule 26, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 37(c)(1)(C) additionally permits a district court "on motion and after giving an opportunity to be heard" to "impose other appropriate sanctions[,]" for such violations. *Id.* The district court concluded that excluding Dr. Filler from testifying was an appropriate additional sanction under Rule 37.

In considering whether to impose a sanction beyond the automatic sanction in Rule 37(c)(1), district courts consider the four factors set forth in *Anderson v. Foundation for*

13

*Advancement of American Indians*, 155 F.3d 500 (4th Cir. 1998).[3] These factors include: 1) whether the non-complying party acted in bad faith; 2) the amount of prejudice caused by the noncompliance to the adversary; 3) the need for deterrence of that particular sort of noncompliance; and 4) whether less drastic sanctions would have been effective. *Id.* at 504 (citing *Wilson v. Volkswagen of Am., Inc.*, 56 F.2d 494, 505–06 (4th Cir. 1977)). The district court properly relied on this four-factor framework in determining whether to exclude Dr. Filler's testimony. We review the district court's application of each of the *Anderson* factors for an abuse of discretion. *Id.*

With respect to the first *Anderson* factor, bad faith, Dr. Haysbert argues that the district court abused its discretion by not making explicit its finding of bad faith. We disagree. The district court recounted, in great detail, a number of instances where Dr. Haysbert through actions of her counsel demonstrated bad faith over the course of the litigation. For example, the district court described how Dr. Haysbert waited for more than a year to disclose the NPE Report, ignored important discovery milestones, and failed to timely notify Outback and the district court that Dr. Filler prepared a supplemental report. The district court found that Dr. Haysbert acted in bad faith.

With respect to the second *Anderson* factor, prejudice, the district court concluded that Outback would suffer prejudice were Dr. Filler permitted to testify during *Haysbert II*.

---

[3] Outback argues that the five factors considered in *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003), should govern this inquiry. We disagree. *Southern States* concerned the imposition of the automatic preclusion sanction under Federal Rule of Civil Procedure 37(c)(1), not the imposition of an additional sanction imposed under Rule 37(c)(1)(C).

14

Notably, the district court considered that Dr. Filler obtained new records, ordered testing, and drew new opinions related to Dr. Haysbert's injuries after the mistrial had been ordered in *Haysbert I*. The district court understood Dr. Haysbert's telehealth visit with Dr. Filler to have been, at least in part, in preparation for further litigation. The district court noted that Dr. Haysbert waited a year to notify Outback about Dr. Filler's newly acquired knowledge. Given the unique procedural history of this case, including the order in connection with the voluntary dismissal that limited further discovery, the district court's conclusion that Outback would be prejudiced by Dr. Filler's testimony was not an abuse of discretion.

On the third *Anderson* factor, the need for deterrence, the district court found that the many discovery disputes in *Haysbert I* supported a finding that the automatic sanction precluding the NPE Report from coming into evidence, with nothing more, would be insufficient to deter future noncompliance. The district court did not clearly err in finding that there was a strong need for deterrence given the conduct of Dr. Haysbert's legal counsel throughout the litigation.

Finally, on the fourth *Anderson* factor, the possibility of less drastic sanctions, the district court found that excluding Dr. Filler's testimony was an appropriate sanction because of risk of prejudice to Outback. The district court concluded that such potential could not be mitigated an order limiting Dr. Filler's testimony. District courts maintain great discretion in determining appropriate sanctions. *See Smith v. Devine*, 126 F.4th 331, 342 (4th Cir. 2025) ("Courts have broad discretion to manage discovery, including the authority to impose sanctions for discovery abuses as part of their case management

15

responsibilities."). While the district court may have fashioned a different sanction, the sanction it chose to impose under the circumstances does not amount to an abuse of discretion.

In light of the protracted and contentious procedural history in this case, we cannot say that the district court abused its discretion in disallowing Dr. Filler's testimony.

## C. *Batson* Challenge

Last we turn to Dr. Haysbert's challenge to Outback's use of a peremptory strike against a Black potential juror in *Haysbert II*. In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibited a prosecutor from striking potential jurors on account of race. 476 U.S. at 89. This prohibition has been extended to private litigants in civil cases. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991) ("Recognizing the impropriety of racial bias in the courtroom, we hold the race-based exclusion violates the equal protection rights of the challenged jurors.").

*Batson* and its progeny set forth a three-step framework to determine whether a litigant has improperly employed a peremptory strike on the basis of race. *Pitchford v. Cain*, 146 S. Ct. 1345, 1349 (2026). The party bringing the *Batson* challenge must first make a *prima facie* showing that a peremptory strike was based on race. *Id.* If the moving party successfully makes such a showing, the party that struck the prospective juror is called upon to provide a race-neutral reason for the challenged strike. *Id.* At step three, the moving party bears the burden to prove that the proffered race-neutral reason is not, in fact, the true reason for the peremptory strike. *United States v. Parada*, 134 F.4th 188, 200–01 (4th Cir.

16

2025). The ultimate inquiry is whether the party that exercised the peremptory strike was "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi*, 588 U.S. 284, 288 (2019) (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)). The burden of persuasion in this inquiry remains at all times with the moving party. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) ("[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.").

On appeal from the denial of a *Batson* challenge, we review the district court's determination on discriminatory intent for clear error, giving deference to the trial court's factual determinations. *Flowers*, 588 U.S. at 303. The trial court is in the best position to observe the demeanor of the party's counsel that exercised the peremptory strike and to assess the reasonableness or improbability of the explanations provided. *Id.* "A finding is 'clearly erroneous' when 'the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Chaudhri*, 134 F.4th 166, 181 (4th Cir. 2025) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). With these principles in mind, we analyze the district court's ruling on Dr. Haysbert's *Batson* challenge.

The parties agree that Dr. Haysbert established a *prima facie* showing under *Batson*. Before striking Juror Number 32, Outback had struck Juror Number 1, the only other Black person in the jury pool. Dr. Haysbert's counsel argued that Outback's subsequent strike of Juror Number 32 demonstrated that Outback struck jurors on the basis of race because "two out of the[ir] three strikes" were used to remove the only two Black potential jurors. J.A. 1098.

17

At the second step of the *Batson* framework, Outback provided three allegedly race-neutral reasons for striking Juror Number 32. Outback contended that it struck Juror Number 32 because he was significantly younger than every other juror in the jury pool, because he did not speak during *voir dire*, and because he worked at the shipyard. The district court concluded that Outback met its burden to put forward a legitimate race-neutral reason for the strike.

At the third step, Dr. Haysbert attempted to demonstrate that Outback's reasons were pretextual and that race was the real reason for the strike. Dr. Haysbert argued that "youth is not a viable or appropriate distinguishing feature," and that the jury pool skewed "considerably older than mid-20s and mid-30s", which she asserted, made "concerns because of his relative youth . . . inappropriate." *Id.* at 1100–01. She also claimed that age could be a benefit given the court's earlier concerns about a juror serving as a "mini expert." *Id.* at 1101. As to Juror Number 32's silence during *voir dire*, Dr. Haysbert noted that both parties had an opportunity to suggest additional questions to the district court's *voir dire* and that there were "quite a few jurors" who chose to say nothing. *Id.* She argued that non-responsiveness was not a distinguishing factor between jurors, but rather, race was. Earlier, Dr. Haysbert had also observed that Juror Number 32 was not the only potential juror who worked at the shipyard, though she put forward no argument that Outback's shipyard reason was pretextual.

The district court considered the arguments from both sides and concluded at the third step of the *Batson* framework that Dr. Haysbert had not met her burden to show that

18

Outback was motivated in substantial part by discriminatory intent. Dr. Haysbert contends this ruling was clear error. We disagree.

Striking a juror because of age can be an acceptable trial strategy. *See Chaudhri*, 134 F.4th at 181. Outback explained it had been concerned that Juror Number 32's relative youth was significant because of the complicated medical evidence in the case. Dr. Haysbert argues on appeal that Outback's reasoning is undercut by Outback's failure to use a peremptory strike against Jury Number 26, who reported that he suffered from memory loss. The district court considered this argument and concluded, based on Juror Number 26's testimony, that his memory loss would not so affect his ability to serve on the jury as to support a for-cause strike.

With respect to Juror Number 32's silence during *voir dire*, Dr. Haysbert observes that half of the potential jurors from which the final jury was selected remained silent during *voir dire* and nearly a third of those—none of whom are Black—were chosen to serve on the jury without objection from Outback. A party appealing the denial of a *Batson* challenge need not identify an identical, non-Black juror for a side-by-side comparison to show discriminatory intent. *Flowers*, 588 U.S. at 311–12; *see also Miller-El v. Dretke*, 545 U.S. 231, 247 n. 6 (2005) (rejecting a *per se* rule requiring identical jurors because "potential jurors are not products of a set of cookie cutters"). Outback argues the other potential jurors who did not speak during *voir dire* can be distinguished by additional factors including their age and place of employment. And Dr. Haysbert did not identify a comparable potential juror.

19

Finally, with respect to Outback's rationale that Juror Number 32 worked in the shipyard, Dr. Haysbert points out that Outback did not strike the two other potential jurors who worked at the shipyard, neither of whom is Black. "Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred." *Flowers*, 588 U.S. at 311. "When a [litigant's] 'proffered reason for striking a [B]lack panelist applies just as well to an otherwise-similar non [B]lack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination.'" *Id.* (quoting *Foster*, 587 U.S. at 512). Dr. Haysbert's comparator argument is undermined, however, by the fact that the two other potential jurors who worked in the shipyard were struck by Dr. Haysbert herself—thus no longer in the potential jury pool—*before* Outback struck Juror Number 32. Based on this record, we discern no clear error in the district court's determination that Outback's concerns regarding Juror Number 32's place of work were not pretextual.

Ultimately, we are not left with "the definite and firm conviction" that the district court erred when it rejected Dr. Haysbert's *Batson* challenge. *Anderson*, 470 U.S. at 573 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). The persuasiveness of a counsel's justification for a peremptory strike "comes down to whether the trial court finds the [counsel's] race-neutral explanations to be credible. Credibility can be measured by, among other factors, the [counsel's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). Here, the district court listened to the parties' arguments and observed the demeanor of counsel. The district

20

court found Outback's purported race-neutral reasons credible and concluded that Dr. Haysbert failed to meet her burden on intentional discrimination. Providing deference to the credibility determinations of the district court and considering the relevant facts and circumstances, we discern no clear error and affirm the district court's ruling on Dr. Haysbert's *Batson* challenge.

## III.    Conclusion

For the foregoing reasons, we affirm the rulings of the district court.

*AFFIRMED*